# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

PATRICIA M. JOHNSON,                    }
                                        }
      Plaintiff,                    }
                                        }
v.                                      }          Case No.:  4:05-CV-1603-RDP
                                        }
CRACKER BARREL OLD                      }
COUNTRY STORE, INC.,                    }
                                        }
      Defendant.                    }

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court is Defendant Cracker Barrel Old Country Store, Inc.'s Motion for Summary Judgment (Doc. # 34) filed on November 30, 2006.  The motion has been fully briefed by the parties and came under submission on January 1, 2007.  The court heard oral argument on the motion on January 26, 2007.  For reasons outlined more fully below, the court finds the motion is due to be granted, and all claims against Defendant Cracker Barrel Old County Store, Inc. ("Defendant" or "Cracker Barrel") are due to be dismissed.

## II.    STATEMENT OF FACTS

### A.    The Johnson's Alleged Trip To Cracker Barrel.

Mr. Johnson alleges that he and Mrs. Johnson ate at the Moody/Leeds Cracker Barrel on Thursday, March 18, 2004 at about 4:00 p.m.  (Doc. # 32 Ex. 1 at 24–26).  He testified that their 4:00 p.m. meal was their first meal of the day, and that neither he nor his wife had anything to eat from the time they woke up until 4:00 p.m.  (Doc. # 32 Ex. 1 at 44).  He does not know or remember what Mrs. Johnson ate on March 17, 2004.  (Doc. # 32 Ex. 1 at 45–46).  He said that they regularly ate at

this Cracker Barrel one to two times per month.  (Doc. # 32 Ex. 1 at 22).  On March 18, 2004, he ate mashed potatoes, corn, apples, and meatloaf, and he testified that his meal tasted fine.  (Doc. # 32 Ex. 1 at 23, 26–27).  Mr. Johnson recalls that Mrs. Johnson had chicken and dumplings, green beans, and corn bread, and that she did not complain about her meal and ate all of it.  (Doc. # 32 Ex. 1 at 23–27).

Additionally, Mrs. Johnson was a critical care nurse at Carraway Hospital.  (Doc. # 32 Ex. 1 at 12).  She worked in the intensive care unit, and worked the week of her visit to Cracker Barrel. (Doc. # 32 Ex. 1 at 12; Doc. # 32 Ex. 2).

**B.**     **Mrs. Johnson's Sickness**.

Approximately thirty to forty-five minutes after leaving Cracker Barrel, Mrs. Johnson began having symptoms of illness, complaining about her stomach, and approximately one hour and forty-five minutes later she began vomiting and having diarrhea.  (Doc. # 32 Ex. 1 at 28–29, 33).  She told her husband that she thought she might have a stomach virus.  (Doc. # 32 Ex. 1 at 31).  Her symptoms persisted over the next two days, but, when her husband asked her if she needed to go to a doctor, she declined.  (Doc. # 32 Ex. 1 at 32–38).  Mr. Johnson stated that on Saturday evening, approximately fifty-two hours after Mrs. Johnson became ill, he left home for approximately twenty-five minutes to get more Diet Mountain Dew, and returned to find Mrs. Johnson in the bathroom dead.  (Doc. # 32 Ex. 1 at 32–39).  At the time of her death, Mrs. Johnson was still symptomatic, in that she was still vomiting and having diarrhea.  (Doc. # 32 Ex. 1 at 38–39; Doc. # 32 Ex. 3 at 23).  Mrs. Johnson was sick for approximately fifty-two hours before she died.  (Doc. # 32 Ex. 1 at 32–39).  She was 52 years old when she died, weighed about 225 pounds, and was on numerous medications.  (Doc. # 32 Ex. 4 Attach. A).

2

####    C.        **Mr. Johnson's Proposed Expert Witnesses**.

Plaintiff has two proposed expert witnesses—Dr. Bayard Tynes, who is a retired internist who specialized in infectious diseases and currently teaches medicine part time at the University of Alabama in Birmingham, and Dr. John VandeWaa, who is an Associate Professor of Medicine at the University of South Alabama and Interim Division Director for Infectious Diseases.  (Doc. # 32 Ex. 5 at 9–11; Doc. # 32 Ex. 3 at 14).   Neither Dr. Tynes nor Dr. VandeWaa treated Mrs. Johnson. Their opinions are based solely on the symptoms that Mr. Johnson has testified she exhibited.  (Doc. # 32 Ex. 3; Doc. # 32 Ex. 5 at 23–26).

Dr. Tynes and Dr. VandeWaa opine that a toxin produced by Staphylococcus Aureus ("staph"), a common bacterium found in/on the human body, is the most likely cause of Mrs. Johnson's death.  (Doc. # 32 Ex. 5 at 23–24, 26–27, 108–109; Doc. # 32 Ex. 3 at 19–20, 29). However, Dr. VandeWaa also considers bacillus cereus another less likely possibility.  (Doc. # 32 Ex. 3 89–90).

Both of Plaintiffs' proposed experts and Defendant's proposed expert have testified that the incubation period for staph is between two and six hours, and have acknowledged that Mrs. Johnson's symptoms began within forty-five minutes of her meal.  (Doc. # 32 Ex. 6 at 92–93; Doc. # 32 Ex. 3 at 21–22; Doc. # 32 Ex. 5 at 75).   Dr. VandeWaa also admits that forty-eight hours of vomiting is "on the end of the extent of the usual courses" for staph, and that Mrs. Johnson vomited longer than is typically expected with staph.  (Doc. # 32 Ex. 3 at 82–83, 105).

Plaintiff's proposed experts have different theories as to how the staph may have contaminated any food that Mrs. Johnson may have eaten.  Dr. Tynes believes the staph may have gotten in the chicken and dumplings after they were mixed together. (Doc. # 32 Ex. 5 at 39).  Dr.

3

VandeWaa believes it may have been in the chicken itself.  (Doc. # 32 Ex. 3 at 31).  Both admit that in order for Cracker Barrel to be the source of the staph, the chicken or dumplings that Mr. Johnson says his wife ate had to have been contaminated with staph after they were cooked, but before they were served.  (Doc. # 32 Ex. 5 at 28–30, 41–44, 51; Doc. # 32 Ex. 3 at 26–27, 52).  However, Dr. Tynes and Dr. VandeWaa admit that they proffer their opinions without having all the relevant facts concerning the conditions surrounding Mrs. Johnson's possible staph infection, including: (1) the effect, if any, of Mrs. Johnson's work as a critical care nurse on her death (Doc. # 32 Ex. 5 at 19; (2) what, if anything, she ate before going to Cracker Barrel (Doc. # 32 Ex. 3 at 58–59, 74); (3) how many people ate chicken and dumplings that day at that Cracker Barrel (Doc. # 32 Ex. 5 at 53); and (4) what any tests (which were not performed at the autopsy but could have been) would have revealed about what type of bacteria or virus caused the gastroenteritis that led to Mrs. Johnson's death (Doc. # 32 Ex. 5 at 22–23, 25).

There also appear to be several unsupported assumptions underlying Dr. Tynes' opinions. Dr. Tynes has admitted that he is "assuming" that Mrs. Johnson got staph from the chicken and dumplings, and believes that staph is the most likely explanation for Mrs. Johnson's sickness because he believes staph to be the most common cause of food poisoning.  (Doc. # 32 Ex. 5 at 24, 31–32).  Dr. Tynes has suggested that a food handler could have contaminated the chicken with staph after the chicken was cooked but he cannot specify how or whom.  (Doc. # 32 Ex. 5 at 43).  In proffering this theory, Dr. Tynes also admits that he has assumed the chicken was cooked, then contaminated, and then sat for an extended period before it was served; in fact, he assumes it was held from 10:30 a.m. until Mrs. Johnson's alleged meal at 4:00 p.m., but admits that he does not know any of those facts to be true.  (Doc. # 32 Ex. 5 at 52–53).

4

Defendant counters this assertion by pointing out that because chicken and dumplings is a popular meal—and because multiple batches are cooked throughout the day—the chicken served at 4:00 p.m. almost certainly did not come from the first batch of chicken prepared at about 10:00 a.m. that day. (Doc. # 32 Ex. 7 ¶ 20). In fact, chicken served at 4:00 p.m. was most likely held for only one to three hours. (Doc. # 32 Ex. 7 ¶ 20; Doc. # 32 Ex. 8 ¶ 8).

The stability of his conclusions was further undermined by Dr. Tynes' admission that he would need to know the inoculum (type and concentration) of staph and the tolerance of the person to determine how long the food would have to be sitting out to make a sufficient amount of toxin for Mrs. Johnson to get sick; therefore, he admits that he cannot say, within a reasonable degree of medical certainty, that anything she ate caused her infection and subsequent death. (Doc. # 32 Ex. 5 at 59–60). Dr. Tynes has admitted that for his opinion to be supportable, there had to be "a break in technique somewhere." (Doc. # 32 Ex. 5 at 48, 51). Dr. Tynes also admits that: (i) symptoms from staph food poisoning usually resolve in a day or two; (ii) it is uncommon for anyone to die of staph; and (iii) without doing any tests, he cannot rule out other possible bacteria or viruses. (Doc. # 32 Ex. 5 at 21–22, 67, 70).

There are questionable assumptions underlying Dr. VandeWaa's conclusions as well. He admits that staph does not grow on cooked meat held above 140º. (Doc. # 32 Ex. 3 at 32–33, 35, 38). He also testified that the permissive temperature at which staph can multiply is below 100º, and even then there has to be a significant amount of time for the organism to multiply. (Doc. # 32 Ex. 3 at 40). Dr. Tynes has agreed with these opinions. (Doc. # 32 Ex. 5 at 46, 58–59). Dr. VandeWaa also admitted that if chicken is cooked, then contaminated, and then served five hours later—but kept above 140º for those five hours (which is part of Cracker Barrel's food handling policy)—it would

5

be very rare and unusual for someone to get staph from the chicken.  (Doc. # 32 Ex. 3 at 53–54).

According to Dr. VandeWaa, "[I]f the food is uncontaminated, contaminated but then immediately

cooked, and kept at the proper temperatures or immediately served, there is no time for staph to

replicate, to form toxin to make you sick."  (Doc. # 32 Ex. 3 at 56).  Although Dr. VandeWaa is

basing his opinion on an assumed break in Cracker Barrel's food safety procedures, he does not

know how the food was prepared, by whom, or how it may have been contaminated.  (Doc. # 32 Ex.

3 at 38–40).  He further concedes that if someone had as severe an exposure to staph as would be

required to produce Mrs. Johnson's extreme symptoms, then it is likely more customers would have

also been exposed to the staph.  (Doc. # 32 Ex. 3 at 26).

    **D.**       **The Death Certificate and The Autopsy Report**.

The death certificate states that Mrs. Johnson's cause of death was "complications of acute

gastroenteritis."  (Doc. # 32 Ex. 9).  Dr. Craig performed an autopsy on Mrs. Johnson shortly after

her death and was the only expert in this case to perform any physical examination of Mrs. Johnson

after her death.[1]  (Doc. # 32 Ex. 4).  Dr. Craig's autopsy report concluded that the cause of death was

complications of acute gastroenteritis, and in the "Comments" section of the autopsy he stated:

> The presence of watery stool in the large intestines without mucosal ulcerations
> suggests an acute gastroenteritis due to an enterotoxin produced by bacteria.  In this
> situation, a stool culture would be negative and there are no tests for enterotoxins.
> Acute gastroenteritis due to enterotoxins is usually the result of bacterial production
> of the enterotoxin in food prior to consumption and not due to infection and growth
> of the bacteria in the gastrointestinal tract.

(Doc. # 32 Ex. 4).  No tests were run to identify any enterotoxin during the autopsy; thus, no

evidence of any enterotoxin actually exists, a fact about which both Plaintiff's and Defendant's

---

[1]As already noted, Mrs. Johnson was not seen by a physician before her death.

experts agree.  (Doc. # 32 Ex. 4; Doc. # 32 Ex. 6 at 92; Doc. # 32 Ex. 5 at 22–23, 25).

According to Dr. Craig, it is impossible to state the cause of the gastroenteritis with any reasonable degree of medical certainty, and it is impossible at this point to know whether the gastroenteritis was bacterial or viral.  (Doc. # 32 Ex. 4).  Dr. Craig further stated there is no way to state with any reasonable degree of medical certainty that the cause of Ms. Johnson's gastroenteritis was staph.  (Doc. # 32 Ex. 4).

**E.     Cracker Barrel's Food Safety Program**.

Cracker Barrel has numerous policies and procedures to ensure food safety.  (Doc. # 32 Ex. 7 ¶ 4; Doc. # 32 Ex. 8 ¶ 2).  Specifically, Cracker Barrel uses the "HACCP" system (Hazardous Analysis Critical Control Points), which are voluntary standards and procedures that meet, and in most cases far exceed, analogous food safety requirements imposed by state law.  (Doc. # 32 Ex. 11 at 120–21; Doc. # 32 Ex. 8 ¶ 4).  As part of the HACCP system, Cracker Barrel uses written checklists, including the Opening/Closing Manager's checklist, the Critical Item checklist, Grill Line Quality & Temperature Inspection checklists, and production charts.  (Doc. # 32 Ex. 7 ¶ 6; Doc. # 32 Ex. 10).  The checklists are designed to help verify that food is cooked to the proper temperature, held at an appropriate temperature, and if not timely served to a customer, then disposed of promptly. (Doc. # 32 Ex. 7 ¶ 6).  Completed checklists are filed at the restaurant on a rolling, thirty day basis, then reviewed by a District Manager several times per month.  (Doc. # 32 Ex. 11 at 135–37; Doc. # 32 Ex. 8 ¶ 6).

The Leeds Cracker Barrel has consistently received high scores on the random inspections by the Alabama Department of Health, including a score of 92 just three days before Mr. Johnson claims he and his wife ate there.  (Doc. # 32 Ex. 12; Doc. # 32 Ex. 8 ¶ 3).  The Department of Health

requires cooked chicken to be held at or above 140º.  (Doc. # 32 Ex. 7 ¶ 18).

  **F.  Cooking Procedures for Cracker Barrel's Chicken and Dumplings**.

  The chicken served as part of Cracker Barrel's chicken and dumplings offering arrives at Cracker Barrel frozen in 20 lb. boxes, and has already been tested for any harmful organisms.  (Doc. # 32 Ex. 7 ¶ 12).  It is stored at Cracker Barrel in a freezer kept at or below 0º Fahrenheit.  (Doc. # 32 Ex. 7 ¶ 13).  When the frozen chicken tenderloins are ready for use, they are taken out of the box and placed in boiling water.  (Doc. # 32 Ex. 11 at 76–77 & Attach. 1).  At least two pounds—and up to ten pounds—of tenderloins are cooked at a time.  (Doc. # 32 Ex. 7 ¶ 15; Doc. # 32 Ex. 11 Attach. 1).  The tenderloins are boiled for approximately six minutes.  (Doc. # 32 Ex. 7 ¶ 16).

  After each batch of chicken tenderloins has been fully cooked, the tenderloins are checked with a thermometer, and the internal temperature of the tenderloins must be at least 165º.  (Doc. # 32 Ex. 11 at 76–77 & Attach. 1).  After it is cooked, the chicken may be put in a pan and placed on a heated "steamline," where it is held at a temperature of between 160º and 170º.  (Doc. # 32 Ex. 7 ¶ 18).  If the chicken is not needed immediately, it is put in a pan, covered with plastic wrap, labeled, and held in the "Hot Box" at temperature between 160º and 170º.  (Doc. # 32 Ex. 7 ¶ 18).

  Dumplings are boiled for five minutes and then simmered for twenty additional minutes.  (Doc. # 32 Ex. 7 ¶ 21).  When they are fully cooked, they are checked with a thermometer and the internal temperature of the dumplings must be at least 190º.  (Doc. # 32 Ex. 7 ¶ 22).  The cooked dumplings are put in a pan and placed on a heated "steamline," and held between 160º and 170º.  (Doc. # 32 Ex. 7 ¶ 23).  If the dumplings are not needed immediately, they are covered, labeled, and placed in the "Hot Box."  (Doc. # 32 Ex. 7 ¶ 23).

### G.      Defendant's Proposed Expert.

Dr. Phillip Smith is a Professor of Gastroenterology at UAB Medical School, who has both treated patients with gastrointestinal disorders and food-borne illnesses, and conducted research in those areas.  (Doc. # 32 Ex. 6 at 5–34).  Dr. Smith testified there would have to be a considerable time and the correct temperature in order for staph-contaminated food to produce enough toxin to cause illness, and noted that staph can survive only when kept between 41º and 140º.  (Doc. # 32 Ex. 6 95–96, 106–14).  According to Dr. Smith, in order for staph to produce enough toxin to cause symptoms of illness, it must have sufficient time to multiply and reach 100,000 organisms of toxin per gram of tissue.  (Doc. # 32 Ex. 6 at 106–13).  Dr. Smith opined that, in order to reach 100,000 organisms per gram of tissue in this case, the toxin would have needed to undergo approximately ten "doubling times" (*i.e.*, the time it takes the substance to double in number/amount), which would have required a minimum of five hours under ideal circumstances and up to twelve hours of growth at a holding temperature below 140º.  (Doc. # 32 Ex. 6 at 106–13).

Dr. Smith also has testified that it is extremely unlikely that an individual with staph would exhibit symptoms for fifty-two hours, since symptoms of staph generally resolve within several hours.  (Doc. # 32 Ex. 6 at 93–94).  He stated that an individual will have symptoms for up to twelve hours only in rare circumstances, and he has never even heard of an individual with staph exhibiting symptoms for such an extremely long period or dying from staph.  (Doc. # 32 Ex. 6 at 93–94, 103, 105).

Smith notes that tests could have been performed on Mrs. Johnson to determine if there was any staph, but no such tests were done, and he has concluded that, absent such test results, it is impossible to state the cause of Mrs. Johnson's death with a reasonable degree of medical certainty.

(Doc. # 32 Ex. 6 at 77, 91–93, 99).  Smith stated that, given the severity of Mrs. Johnson's sickness, the amount of staph toxin required to produce such symptoms would mean that the entire batch of chicken was contaminated, that there would be a 100% attack rate, and thus dozens of other people would have experienced similar symptoms.  (Doc. # 32 Ex. 6 at 94–95; *see also* Doc. # 32 Ex. 3 at 26).  Thus, the fact that, aside from this lawsuit, no one has claimed to have become sick from eating at the Leeds Cracker Barrel on March 18, 2004, or, for that matter, in the entire month of March 2004, merits consideration.  (Doc. # 32 Ex. 7 ¶ 25).

## III.     SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a

10

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point

11

out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV. DISCUSSION

This is a wrongful death case where Plaintiff alleges claims for negligence, breach of warranty, and violation of the Alabama Manufacturers' Extended Liability Doctrine (AMELD). From a human standpoint , the court sympathizes with Plaintiff and the tragedy he has suffered with the loss of his wife. Nevertheless, the court must approach the motions that are pending from a legal standpoint. The court finds that Defendant is entitled to judgment as a matter of law on the negligence and AMELD claims because: (1) Plaintiffs' proposed experts' testimony cannot meet the *Daubert* standards of reliability and helpfulness to the jury, and, thus Plaintiff cannot prove causation or even show that Mrs. Johnson's death was, in fact, caused by staph; and (2) Plaintiff cannot establish that the food was unsafe, and therefore cannot make out a *prima facie* case of negligence or establish a defect under the AMELD. Furthermore, the court concludes that Defendant is entitled to summary judgment on Plaintiff's breach of warranty claims because a wrongful death plaintiff cannot sue for breach of warranty under Alabama law. Therefore, all of Plaintiff's claims against Defendant are due to be dismissed.

12

A. **Plaintiff's Claims for Negligence and under the AMELD Must Fail as His Proposed Experts' Testimony Cannot Meet the *Daubert* Standards of Reliability and Helpfulness to the Jury, and, Thus He Cannot Establish Causation or Even the Source of Mrs. Johnson's Illness.**

1. **The *Daubert* Standard.**

In *Daubert*, the Supreme Court held that the Federal Rules of Evidence mandate that the trial judge act as a gatekeeper, and exclude unreliable expert testimony, so as to ensure the jury receives only reliable and relevant scientific testimony. *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579, 589, 592–93 (1993); *see also* FED R. EVID. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158–59 (1999) (noting the trial court has no "discretion to abandon the gatekeeping function … [or] to perform the function inadequately"); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 148 (1997) (reiterating that "[n]either the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose"); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (stating that "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology"). The Eleventh Circuit has explained the demands of a *Daubert* analysis and the trial court's gate-keeping function under it:

> *Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the [factfinder]. As a gatekeeper the court must do "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." The proposed testimony must derive from the scientific method; good grounds and appropriate validation must support it. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." The court must consider the testimony with the understanding that "[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ."

*McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1237–38 (11th Cir. 2005) (internal citations

13

omitted).  "The 'gatekeeping' function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir.2002)).

A *Daubert* analysis consists of a two-pronged test: (1) whether the expert's testimony is reliable, being grounded in scientific knowledge; and (2) whether the testimony is relevant, thereby assisting the trier of fact to evaluate the issues in the case.  *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (2004).  Elaborating on the first prong, the *Daubert* court proposed a non-exhaustive list of four factors to facilitate the trial court's review of expert testimony admissibility.  These suggested factors included: whether the theory or technique "can be (and has been) tested;" "the known or potential rate of error;" "whether the theory or technique has been subject to peer review and publication;" and  whether the scientific theory or technique has gained "general acceptance" in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94.

The key to analyzing the second prong of *Daubert* is determining whether the expert's testimony assists the trier of fact.  *McDowell*, 392 F.3d at 1299 (citing Fed. R. Evid. 702).  This "inquiry must be 'tied to the facts' of a particular 'case.'"  *Kumho*, 526 U.S. at 150 (1999) (citing *Daubert*, 509 U.S. at 591.  In other words, "[t]he relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case. . . . [T]here is no fit where a large analytical leap must be made between the facts and the opinion."  *McDowell*, 392 F.3d at 1299 (citing *Daubert*, 509 U.S. at 591; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Using the framework outlined above as a guide to assess the admissibility Plaintiff's experts' testimony in this case, the court finds that the testimony of both Dr. Tynes and Dr. VandeWaa fails

14

both prongs of the *Daubert* test.  As to reliability, the court concludes that both experts' testimony about the cause of Plaintiff's death and possible contamination of the chicken is lacking the appropriate scientific foundation and is too speculative in nature to be considered "scientific knowledge," which the *Daubert* standard demands.  Moreover, the court does not believe these experts' testimony would be helpful to the jury, and so it would be excluded as irrelevant under the Federal Rules of Evidence.

### 2.    Dr. Tynes' and Dr. VandeWaa's Theories of Causation Are Unsubstantiated.

Although Dr. Tynes and Dr. VandeWaa may be highly qualified physicians, researchers, and professors, the court must consider the scientific bases of their testimony to determine its reliability. For it to be reliable, their testimony must be "'scientific,' meaning grounded in the methods and procedures of science," and must represent "'knowledge,' meaning something more than subjective belief or unsupported assumptions." *McDowell*, 392 F.3d at 1298.  This inquiry is separate from that into Dr. Tynes' and Dr. VandeWaa's  professional and experiential qualifications, which the court does not question; however, "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method."  *Id.*

The court will analyze the discrete questions on which these experts' testimony is to be offered to the jury—*i.e.*, how Mrs. Johnson died and how a defect in Defendant's food caused her death.  As Plaintiff complains that Defendant's negligence allegedly caused the defect that resulted in Mrs. Johnson's wrongful death, the relevant medical testimony by these experts would involve only that testimony related to the actual cause of Mrs. Johnson's death and any associated negligence of Defendant or defect in the food it served her.

There is no question that Mrs. Johnson: (1) became ill some time after eating at Cracker Barrel on March 18, 2004; (2) later died on March 20, 2004; and (3) that her death certificate states she died of complications of acute gastroenteritis.  Plaintiff attempts to establish, through expert testimony, that the gastroenteritis was caused by staph, which contaminated the chicken and/or dumplings that Mrs. Johnson ate at Cracker Barrel.  However, Plaintiff's experts cannot point to any evidence that anything was wrong with the chicken or the dumplings.  Further, there is no evidence that either were contaminated with staph, and no evidence that staph was the proximate cause of her death.  This lack of sufficient evidence precludes the admission of their testimony because of its unreliability under *Daubert*.  It also prevents Plaintiff from withstanding summary judgment. *See Daubert*, 509 U.S. at 589, 592–93; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Applying the four *Daubert* factors cited above to Plaintiffs' experts proposed testimony, the court finds it to be unreliable.  In this Circuit, "[a]n expert opinion is inadmissible when the only connection between the conclusion and existing data is the expert's own assertions."  *McDowell v. Brown*, 392 F.3d 1283, 1300 (2004).  Most tellingly, Dr. Tynes and Dr. VandeWaa simply have *no* data upon which their opinion regarding the cause of death *in this particular case* (or their proposed theory of causation) could be based.  Dr. Craig, the medical examiner and only medical professional to examine Mrs. Johnson in this case, performed no test to determine whether any toxin existed in Mrs. Johnson's body at her time of death, much less caused her death.  (Doc. # 32 Ex. 4; Doc. # 32 Ex. 5 at 22–23, 25).  Further, Dr. Craig stated that there is no way to state with any reasonable degree of medical certainty (1) the cause of Mrs. Johnson's gastroenteritis; (2) whether the cause of the gastroenteritis could have been bacterial or viral in nature; and (3) that the cause of Ms. Johnson's gastroenteritis was staph.  (Doc. # 32 Ex. 4).  A review of Plaintiff's proposed experts' testimony

reveals the speculation and conjecture involved in rendering their opinions as to how Mrs. Johnson

died and discloses several necessary assumptions and possible inconsistencies in their theories.  (*See*

*e.g.*, Doc. # 32 Ex. 5 at 29–30 (Tynes admitting there is no way to be sure which food item allegedly

contained staph), 59–60 (Tynes conceding his lack of knowledge regarding a timeframe in this case),

48, 51, 59–60 (Tynes' speculation as to some break in Defendant's food handling procedure as the

cause of the food contamination), 70 (Tynes admitting that without doing any tests, he cannot rule

out other possible bacteria or viruses as the source of Mrs. Johnson's infection), 67 (Tynes testifying

that symptoms from staph food poisoning usually resolve in a day or two and that it is uncommon

for anyone to die of staph); Doc. # 32 Ex. 3 at 32–33, 35, 38 (Dr. VandeWaa admitting that specific

temperature and other conditions that are inconsistent with Defendant's food handling procedures

would have had to exist for a significant amount of time for his theory of staph contamination and

infection to be plausible), 53–54 (Dr. VandeWaa admitting that it would be very rare for someone

to get staph, even under these specific conditions), 18–19, 58, 89–90 (VandeWaa conceding that

many different things can cause the symptoms that Mrs. Johnson had, especially highlighting staph

versus bacillus cereus—another potential cause of Mrs. Johnson's illness), 26, 82–83, 105

(VandeWaa admitting that Mrs. Johnson vomited longer than is typically expected with staph, and

that if someone had as severe an exposure to staph as would be required to produce her extreme

symptoms, then more Cracker Barrel customers would also have been exposed).  Accordingly, the

court concludes that these mere assertions and speculations as to "the most likely" cause of Mrs.

Johnson's death are not based on any actual data and fall below the generally accepted standard of

reliability and would be excluded under *Daubert*.  *See McDowell v. Brown*, 392 F.3d 1283, 1300

(2004); *see also Ex parte Diversey Corp.*, 742 So. 2d 1250, 1254 (Ala. 1999) ("Proof which goes

no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.") (internal citation omitted).

      **3.**    **Dr. Tynes' and Dr. VandeWaa's Theories of Causation Would Not Aid the Jury.**

In addition to not being reliable, the court finds that Dr. Tynes' and Dr. VandeWaa's proposed testimony would fail the second prong of the *Daubert* test as it would not aid the jury. *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 591 (1993) (citing FED. R. EVID. 702).  Under *Daubert*, "scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts." *McDowell*, 392 F.3d at 1299 (citing *Daubert*, 509 U.S. at 591); *see also Gen. Electric Co. v. Joiner*, 522 U.S. 136 (1997).  Although generally directed to the issue of causation and Defendant's negligence—the "pertinent facts"—these experts' conclusions require "a large analytical leap [that] must be made between the facts and the opinion" as discussed above, and, therefore, do not have the requisite scientific relationship to those facts.  *Gen. Electric Co.*, 522 U.S. at 146.  For reasons already discussed, these experts can offer little meritorious testimony regarding causation other than speculation and unsubstantiated conclusions.  There simply is not an appropriate fit between their proffered opinions and the facts of this case.  The court must not allow such unreliable testimony to reach the jury because it would only confuse, rather than clarify, the issue for the trier of fact.

      **B.**    **Plaintiff Cannot Establish That the Food Was Unsafe, and Therefore Cannot Make Out a *Prima Facie* Case of Negligence or Establish a Defect under the AMELD.**

Plaintiff claims the gastroenteritis cited as Mrs. Johnson's cause of death on her death

certificate was caused by the chicken or dumplings that she ate at Cracker Barrel.  (Doc. # 1 Ex. A).

Plaintiff relies upon this theory to support his claims of negligence and Defendant's liability under

the AMELD.  (Doc. # 24).  However, Plaintiff has presented no evidence that anything was wrong

with the chicken or dumplings, let alone that they were contaminated with staph.

Under Alabama law, a plaintiff alleging negligence must prove:  (1) a duty owed to him by

the defendant; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury.  *Martin

v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).  In order to establish liability under the AEMLD, a

plaintiff must show that he "suffered injury or damages…by one who sells a product in a defective

condition unreasonably dangerous to the plaintiff as the ultimate user or consumer."  *Sapp v. Beech

Aircraft Corp.*, 546 So. 2d 418, 419 (Ala. 1980).  That is, "a defect in the product must be

affirmatively shown [to establish liability under AMELD]," and the plaintiff must prove causation

in fact.  *Townsend v. Gen. Motors Corp.*, 642 So. 2d 411, 415 (Ala. 1994); *Verchot v. Gen. Motors

Corp.*, 812 So. 2d 296, 301 (Ala. 2001); *Jordan v. Gen. Motors Corp.*, 581 So. 2d 835, 837–38 (Ala.

1991) (stating that in order to survive summary judgment, a plaintiff must present "substantial

evidence" of a defect, and pure speculation or conjecture will not suffice).  Here, Plaintiff cannot

prove that Mrs. Johnson was served tainted food, so he cannot prove a breach of duty or defect

necessary to establish his *prima facie* case under either theory—negligence or the AMELD.

First, the bare allegation that Mrs. Johnson ate at Cracker Barrel on March 18, 2004, became

ill thereafter, and died on March 20, 2004 does not, without more, establish that Defendant breached

any duty or that the food was defective.  As courts routinely hold, the mere showing "that plaintiff

ate food, and in consequence became sick, [does] not make out a prima facie case of negligence."

*McCarley v. Wood Drugs, Inc.*, 153 So. 446, 447 (Ala. 1934); *Evans v. Taco Bell Corp.*, 2005 WL

2333841, at *6–7 (D.N.H. Sep. 23, 2005) ("The mere fact that the plaintiff became nauseous about one-half hour after consuming some of the [food obtained from the defendant] is insufficient to withstand the defendant's motion for summary judgment. There are many different causes of nausea, vomiting and stomach distress. The plaintiff's evidence of impurity leaves her proof in the realm of speculation and conjecture."); *see also Forehand v. Ryan's Family Steak House, Inc.*, 2005 WL 1523381, at *3 (S.D. Miss. June. 28, 2005). In the instant case, the court concludes that both Plaintiff and his experts rely on little more to develop their theories of causation than the fact that Mrs. Johnson ate at Cracker Barrel and later became sick. *See* Part III.A.2. *supra*. Such a conclusory allegation is insufficient to withstand summary judgment. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value on summary judgment" (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985))).

Further, the facts and circumstances surrounding Mrs. Johnson's sickness tend to disprove that her sickness was caused by the chicken or dumplings that she ate at Cracker Barrel. Her husband testified that she reported that the meal she ate at Cracker Barrel tasted fine, and she ate all of it. (Doc. # 32 Ex. 1 at 26–27). The fact that the food's taste and appearance were normal weighs against Plaintiff's theory that the food was contaminated. *McCarley*, 153 So. at 447; *see also Denaro v. 99 Restaurant, Inc.*, 2002 WL 31546120, at *2 (Mass. App. Div. 2002); *Castleberry's Food Co. v. Smith*, 424 S.E. 2d 33, 36 (Ga. App. 1992); *Hairston v. Burger King Corp.*, 764 So. 2d 176, 177 (La. App. 2000).

Third, no other customer reported any sickness from eating at the Leeds Cracker Barrel in the same time period. (Doc. # 32 Ex. 7 ¶ 25, App. Ex. 7). This, too, weighs against Plaintiff's

speculative theory of liability, offered fifteen months after the incident, that Defendant's chicken and dumplings may have been tainted. *Hairston*, 764 So. 2d at 178 (La. App. 2000) (upholding summary judgment for defendant where over 800 Whoppers were served on the day in question, but plaintiff was the only person who claimed to become sick); *Minder v. Cielito Lindo Restaurant*, 67 Cal. App. 3d 1003, 1009 (Cal. App. 1977); *Payton v. Lee*, 77 S.E.2d 77, 79–80 (Ga. App. 1953). This fact becomes increasingly important when one considers that the chicken tenders are cooked in bulk, and that dozens of servings of chicken and dumplings and other chicken entrees were sold on March 18, 2004. Indeed, Plaintiff's own experts testified that other Cracker Barrel guests almost certainly would have become sick if the chicken and/or dumplings were actually contaminated with staph; however, no one else reported any illness or other incident. (Doc. # 32 Ex. 3 at 24, 26; Doc. # 32 Ex. 7 ¶ 25).

Finally, and perhaps most importantly, there is no evidence that the chicken or dumplings were even contaminated with staph. At base, Plaintiff's proposed experts have taken a gigantic analytical leap in assuming that a food handler employed by Defendant contaminated the chicken or dumplings in the first place. There is no evidence to support this assumption. As Plaintiff has failed to present substantial evidence that Defendant breached any duty to Mrs. Johnson or that there was a defect in the chicken and/or dumplings served to Mrs. Johnson, Defendant is entitled to summary judgment on these claims.

### C. A Wrongful Death Plaintiff Cannot Sue For Breach Of Warranty.

Plaintiff's breach of warranty claim is due to be dismissed because Alabama law does not allow a wrongful death plaintiff to bring suit under a breach of warranty theory. As stated by the Eleventh Circuit, "Alabama courts . . . have held that actions for wrongful death can only arise under

Alabama's wrongful death statute," and cannot be brought as breach of warranty claims. *Morris v. SSE, Inc.*, 912 F.2d 1392, 1394 (11th Cir. 1990); *see also McPhail v. Mitsubishi Mfg. of Am.*, 80 F. Supp. 2d 1309, 1318–19 (S.D. Ala. 1997), *aff'd*, 141 F.3d 1190 (11th Cir. 1998) ("Plaintiff is suing for the wrongful death of her son.  Under the rule of *Geohagan*, plaintiff has no cause of action for breach of the implied warranty of merchantability.  Accordingly, summary judgment in favor of defendants is due"); *Geohagan v. Gen. Motors Co.*, 279 So. 2d 436, 439–40 (Ala. 1973) ("We hold that no contractual cause of action for wrongful death is created by our Uniform Commercial Code arising from a breach of warranty, and that actions for wrongful death can arise in this state and be processed only under our wrongful death act.").  Thus, Plaintiff's claim for breach of implied warranty of merchantability is due to be dismissed as a matter of law.

## V.      CONCLUSION

For the reasons discussed above, the court finds Defendant's Motion for Summary Judgment (Doc. # 34) is due to be granted, and all of Plaintiff's claims against Defendant should be dismissed. The court will enter a separate order in accordance with this memorandum opinion.

**DONE** and **ORDERED** this _____2nd_____ day of April, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

22